IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SHERI S.,

                Plaintiff,

vs.

FRANK BISIGNANO, Commissioner
of Social Security,

                Defendant.

8:25-CV-240

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Sheri S.'s application for disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, 1381 *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Court finds that the Commissioner's decision was supported by substantial evidence, so the plaintiff's motion for reversal (filing 24) will be denied, and the Commissioner's motion for an order affirming his decision (filing 28) will be granted.

## I. PROCEDURAL HISTORY

The plaintiff protectively filed for disability insurance benefits on January 6, 2021, alleging disability beginning October 28, 2020. *See* filing 7-3 at 67. She has not worked since March 2017. *See* filing 7-6 at 5. The plaintiff's claims were denied initially on December 14, 2021, and on reconsideration on June 30, 2022. She requested a hearing in front of an administrative law judge (ALJ), which occurred on December 5, 2022. Following that hearing, the ALJ determined the plaintiff was not disabled within the meaning of the Social Security Act. Filing 7-3 at 68.

The plaintiff appealed, and the Appeals Council of the Social Security Administration remanded her case back to the ALJ for further consideration of the plaintiff's limitations and disabling conditions, and to further develop the record. *See* filing 7-3 at 88-90. The plaintiff had a second hearing before the same ALJ on May 14, 2024, who again found the plaintiff was not disabled under the Act. The Appeals Council denied the plaintiff's second appeal. Accordingly, the plaintiff seeks judicial review of the ALJ's second decision as the final decision of the administration under 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND

### 1. MEDICAL AND WORK HISTORY

The plaintiff was born in 1976 and lives in La Vista, Nebraska, with her fiancé, son, and dog. *See* filing 7-5 at 6, 15; filing 13-1 at 384. She has a high school education and her G.E.D. *See* filing 7-6 at 14. She most recently worked as a "cashier/supervisor" at a fast food restaurant, from October 2007 to March 2017. *See* filing 7-6 at 5. Her son was born in 2017, and she has not worked since he was born. The plaintiff has a history of alcohol abuse but has been sober since 2017. *See, e.g.,* filing 8-1 at 94; filing 10-1 at 442; filing 10-1 at 387.

The plaintiff's claim for disability is primarily based on her diagnosis of neuromyelitis optica ("NMO"), which is related to her complaints of low vision, lightheadedness, headaches, constant pain, weakness, memory issues, and trouble standing. *See* filing 7-6 at 13; filing 7-2 at 32. She has been prescribed opioids on-and-off to manage chronic pain dating back to 2015. The following narrative is organized first by the treatment of the underlying disease, and

then treatment of her other ailments: headaches, chronic pain, chronic upper respiratory infections, recurrent shingles, and other acute medical episodes.[1]

(a) NMO Diagnosis and Treatment

On October 22, 2018, the plaintiff called her doctor's office because of all-day, every-day headaches. Filing 8-1 at 102. She also reported memory issues, back and neck pain, and difficulty sleeping. Specifically, she described an episode when she went to the store close to her house, but forgot how to get home and had to call her boyfriend for directions. *See* filing 8-1 at 102. She made an appointment with her primary care physician, Alberto Marcelin, M.D., for October 23.

At that appointment, the plaintiff said she wanted to be evaluated for disability. Filing 8-1 at 100. An MRI, with and without contrast, indicated acute demyelination.[2] Dr. Marcelin presumed the MRI findings were related to Wernicke's encephalopathy, a neurological condition related to alcoholism and caused by thiamine deficiency, "in the setting of poor nutrition, previous alcohol abuse history[,] and low normal thiamine levels." Filing 8-1 at 9.

---

[1] While the plaintiff's symptoms often coincided (that is, she had headaches at the same time as back pain or other chronic or acute issues) the Court has done its best to efficiently summarize the 5,000+ pages of medical records in a thorough, logical format. Not every appointment is detailed below.

[2] Demyelination occurs when the protective covering surrounding nerve fibers is damaged. The most common demyelinating disease is multiple sclerosis. *Demyelinating disease: What can you do about it?* Mayo Clinic (Apr. 27, 2024) https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/expert-answers/demyelinating-disease/faq-20058521 [https://perma.cc/6VY6-7TDY].

Another doctor called the plaintiff with the MRI results on October 26, 2018. The plaintiff said she was having vision issues and headaches. The doctor told her to go to the emergency room, filing 8-1 at 100, where she reported memory loss, left leg numbness, left arm decreased strength, right eye blurred vision, progressive fatigue, loss of appetite, difficulty urinating, diarrhea, headaches, low back pain, and shoulder pain. Filing 8-1 at 26, 94. She was admitted to the hospital.

The hospital performed an MRI of the plaintiff's cervical and thoracic spine, CTs of her brain, and a lumbar puncture procedure. After seven nights, the plaintiff was discharged with suspected Wernicke's encephalopathy. Filing 8-1 at 94. She had no appetite issues while admitted. Filing 8-1 at 95. The plaintiff felt her memory, alertness, and weakness improved during admission, and she had "equal, strong strength" throughout her hospital stay. *Id.* She was steady with a walker. The plaintiff complained of severe headaches "a majority of the admission that varied day to day (right side vs left side vs occipital)." Filing 8-1 at 95. Her headaches did not respond to pain medication, but resolved after receiving IV caffeine. She did not complain of a headache on discharge. *Id.*

Because of her suspected demyelinating disease, the plaintiff began specialized neurological treatment. She saw a neurologist, Krishna Galla, M.D., on December 4, 2018. The plaintiff reported progressive worsening vision and diplopia. She stopped driving and was experiencing balance problems, though she had not lost consciousness. She reported that her headaches were getting worse, though her physical examination indicated improved cognition. Filing 8-1 at 9-12. The next day, another lumbar puncture procedure was performed to test for demyelinating diseases other than multiple sclerosis. Filing 8-1 at 8.

4

The plaintiff saw Richard Legge, M.D., an ophthalmologist at the Nebraska Medicine Truhlsen Eye Institute, on December 11, 2018, for optic neuropathy of both eyes, related to her suspected neurological disease. Dr. Legge suspected, based on the plaintiff's reported eye pain and her testing, that she had multiple sclerosis or NMO. Filing 8-1 at 6.

The plaintiff saw Dr. Galla again on December 12, 2018, to discuss her test results and the findings from Dr. Legge. Imaging indicated spinal lesions and optic neuritis, so the plaintiff was again admitted to the hospital for workup and IV steroid treatment. Filing 8-1 at 6, 399; filing 10-1 at 442. She was in the hospital for six nights. Her visual acuity was "stable to slightly improved during admission." Filing 10-1 at 442. The plaintiff reported headaches and neck spasms, which were treated with pain medication. The plaintiff said her headache improved when she was discharged. Filing 10-1 at 442.

The plaintiff returned to Dr. Legge on January 14, 2019. He noted progressive inflammatory optic neuropathy, and "some improvement" in her demyelinating symptoms "by history with solumedrol." Filing 10-1 at 393.

The plaintiff saw Dr. Galla again on January 16, 2019. The plaintiff reported that, since she had been discharged from the hospital in December, her vision had been progressively getting worse, she occasionally had diplopia, had worsening balance problems and "walks as if she is drunk all the time," and continued "to have poor nutrition." Filing 10-1 at 388. However, she also reported that her vision was "stable or slightly improved subjectively," and her balance and falls were "better." Filing 10-1 at 389.

According to Dr. Galla, the midline lesions on the plaintiff's MRI indicated Wernicke's encephalopathy. The progressive nature of her symptoms and lesions were concerning for possible demyelinating disease involving the

5

brain and spinal cord. NMO antibodies were negative, but her bilateral optic nerve and chiasm involvement supported an NMO or atypical multiple sclerosis diagnosis. Filing 10-1 at 392. Dr. Galla prescribed a new medication for the plaintiff's headaches. She advised the plaintiff that hydrocodone was not a good long-term pain solution, and that the plaintiff's fatigue could be caused by her opioid use. Filing 10-1 at 392.

On February 21, 2019, the plaintiff saw Fuad-Al Ali, M.D., and Mac McLaughlin, M.D., in neurology. The neurologists were unclear on her exact diagnosis, but suspected NMO spectrum disorder. Filing 8-1 at 532. Based on her "worsening symptoms and the potential for recurrent attacks," Dr. Ali and Dr. McLaughlin recommended long-term treatment and Rituximab[3] infusions. Filing 8-1 at 532.

The plaintiff met with Dr. McLaughlin for a neurology appointment on March 26, 2019. She reported good days and bad days regarding her vision and no new neurologic symptoms. She had 20/200 and 20/100 visual acuity with correction. At the time, she had symptoms of an upper respiratory infection, and she was advised to start Rituximab after that illness resolved. She also needed some vaccinations before starting the treatment. Filing 8-1 at 555. She had her first infusion sometime in early May. *See* filing 10-1 at 315.

On April 16, 2019, the plaintiff had a telephone encounter with Dr. Legge. She was "clinically improving," her pain with eye movement was resolved, and her visual acuity was improving. Filing 8-1 at 491. On May 21,

---

[3] Rituximab is a monoclonal antibody therapy usually used to treat certain cancers or immune disorders. *See* Rituximab (intravenous route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/rituximab-intravenous-route/description/drg-20068057 [https://perma.cc/P243-SDE3] (last updated Dec. 1, 2025).

6

2019, after the Rituximab infusion, Dr. Legge noted that the plaintiff was clinically improving, her pain with eye movement was improved, and her visual acuity had improved. Filing 10-1 at 513. He recommended she continue the Rituximab protocol.

The plaintiff went to the ER on June 17, July 6, and July 13, 2019, due to recurrent headaches. Filing 10-1 at 298, 279, 271. Each time, she was treated with Reglan, Benadryl, and Toradol—the "migraine cocktail"—and discharged with improved symptoms.

On July 16, 2019, as a follow up to her July 13 ER visit, the plaintiff saw Jamison Hofer, M.D., in neurology. Filing 10-1 at 262. The plaintiff reported she had "a lot of stress recently," because her landlord was selling her house. Her headaches were getting worse, but the plaintiff denied sensitivity to light or sound. *Id.* The plaintiff told Dr. Hofer her vision would sometimes worsen with headaches, "but then it resolves." Filing 10-1 at 263. The plaintiff's vision was 20/70 left eye and 20/50 right eye, with corrective lenses. Her gait was mildly ataxic and she had decreased strength and weakness in her right hand grip. Filing 10-1 at 266.

Dr. Hofer noted the plaintiff's "history and exam" were reassuring; her headaches were caused by stress, and she "would benefit from a simple outpatient headache prevention regimen." *See* filing 10-1 at 267. She prescribed Vitamin B12, thiamine, a multivitamin, Propranolol, and monthly Amovig injections. The plaintiff was told to follow up with the headache clinic and neurology. *Id.*

At her follow-up appointment with neurology on August 19, 2019, the plaintiff reported she had a headache that was not responding to acetaminophen. Filing 10-1 at 236. She forgot about one medication and didn't take it, and she said another medication, Toradol, "doesn't help." *Id.* She denied

7

changes in her vision, but said her blurry vision was worse with headaches. Overall, the neurologist opined that the plaintiff "has been doing well following" her infusion of Rituximab, "without progression of her symptoms and without side effects." Filing 10-1 at 239. Her next infusion and MRI were scheduled for November. *Id.*

The plaintiff saw Dr. Legge on October 23, 2019. Filing 10-1 at 169. Her bilateral optic neuropathy was clinically improving, and her pain with eye movement, color vision, and visual acuity were improved. Filing 10-1 at 170. Dr. Legge recommended continued Rituximab protocol and a return in three months. *Id.*

On November 5, 2019, the plaintiff saw Dr. McLaughlin in neurology. She reported no benefit from the Amovig that was started in July, and told him she still had neck muscle tightness and headaches, but no new or worsened neurologic symptoms. She also had continued improvement in her vision. Her gait was normal and stable with fluid alternating stride, but she remained slow and cautious, or guarded, with her steps. Filing 9-1 at 207. Dr. McLaughlin recommended she resume taking Vitamins B1 and B12. Filing 9-1 at 208.

On January 28, 2020, the plaintiff saw Dr. Legge. The plaintiff was "clinically improving via visual acuity and visual field," and her pain with eye movement was improved. Filing 9-1 at 196. The plaintiff's retinal nerve fiber layer showed progressive thinning over the previous 13 months, so Dr. Legge told the plaintiff to return in one month to see if thinning had progressed and needed a shortened interval of her Rituximab treatment, or if the thinning was a false positive. Filing 9-1 at 197. But the plaintiff had no further appointments with Dr. Legge through May 2024. *See* filing 7-2 at 67.

The plaintiff saw Dr. Marcelin on February 5, 2020, for her annual exam, and because she was vomiting. Filing 9-1 at 192. Her physical examination was

8

normal; her mood was euthymic, her speech coherent, her thought process appropriate, and she had "good insight and judgment." Filing 9-1 at 193-94. Dr. Marcelin prescribed Reglan for her illness and noted that "nausea and vomiting [are] chronic with the patient." Filing 9-1 at 194. He indicated her sacroiliitis was stable and treated with ibuprofen. *Id*. He also wrote that the patient had a "history of immunosuppressant" that was being monitored by neurology. *Id*. Dr. Marcelin told the plaintiff she had a high BMI, and he recommended weight loss strategies. Filing 9-1 at 195.[4]

On May 7, 2020, the plaintiff met with Dr. McLaughlin in a telehealth visit. Filing 9-1 at 170. She had no new or worsened symptoms, and improved in both her pain and headaches. Filing 9-1 at 171. Her third cycle of Rituximab was scheduled for May 18, despite risks posed by the COVID-19 pandemic. Filing 9-1 at 172.

On May 29, 2020, the plaintiff saw Julie Nieveen, APRN-NP, at the clinic, due to fatigue and "tingling" in her face. Filing 9-1 at 164. Her symptoms were believed to be related to her recent Rituximab injection, or her B12 deficiency. Nieveen restarted the plaintiff on B12 vitamins daily (apparently, she had stopped taking them). Filing 9-1 at 167. When the plaintiff called her neurologist, Dr. McLaughlin said that fatigue was not a side effect of the Rituximab, and he suggested a sleep study. Filing 9-1 at 164.

The plaintiff had a telehealth appointment with Dr. McLaughlin on August 5, 2020. Filing 9-1 at 139. She reported a constant headache for the

---

[4] The lab results from her annual exam indicated the plaintiff had high cholesterol and high blood sugar; the remainder of the diagnostic tests were normal. Filing 9-1 at 191. She was tested for diabetes, but her A1C was normal, and her high blood sugar was likely a fluke. *See* filing 9-1 at 190.

previous three weeks. Dr. McLaughlin advised that she avoid overusing analgesic medications, and told her to discuss using Effexor with her pain specialist. Metoclopramide was discontinued. *Id.*

The plaintiff met with Dr. McLaughlin again via telehealth on November 5, 2020. Filing 9-1 at 112. Her next Rituximab treatment was planned for November 12, 2020. The plaintiff reported that "as she approaches these 6 month infusions, she has some increased occurrence of her headaches" and pain. Filing 9-1 at 113.

On December 24, 2020, the plaintiff called the clinic and spoke with Dr. Marcelin because of an "acute episode of amnesia." Filing 9-1 at 96-97. The plaintiff explained that there were three hours of her day for which she could not account. She denied difficulty ambulating, other memory difficulties, or any systemic symptoms. *See* filing 9-1 at 97. Dr. Marcelin indicated her demyelinating disease was currently stable, and was being closely monitored. *Id.*

The plaintiff saw Dr. McLaughlin on May 6, 2021, to prepare for her fifth cycle of Rituximab. *See* filing 12-1 at 465. Dr. McLaughlin believed she was "over using [T]ylenol and ibuprofen for her headaches." Filing 12-1 at 466. The plaintiff told Dr. McLaughlin that she was getting shingles outbreaks that would usually resolve after a day or two, and reported no other new or worsened symptoms. Her vision was "quite improved" with 20/50 vision in both eyes, "even though she feels like her vision is more blurry today." Filing 12-1 at 467. Her gait was normal and stable.

The plaintiff called her neurologist on August 19, 2021, to report numbness and tingling in her hand and legs, but no weakness. Filing 12-1 at 565. Dr. McLaughlin ordered an MRI, which was done on September 23, 2021. *See* filing 12-1 at 633. Compared to her prior examinations, there was no

10

significant overall interval change, and stable multifocal abnormality. Filing 12-1 at 634.

The plaintiff had a normal neurological exam with Dr. McLaughlin on November 2, 2021. Filing 13-1 at 20-21. She was awake, alert, and able to provide her history in clear, fluent, and appropriate speech. Her vision had slightly improved since May. Her gait was normal and her visual acuity was improved. *Id.*

She met with Dr. McLaughlin again on May 4, 2022. Filing 13-1 at 349. The plaintiff reported that her headaches were increasing in frequency and pain as her next Rituximab infusion approached. She reported no recent shingles outbreak, and viral bronchitis earlier that year from which she had recuperated. The neurological exam was normal. Filing 13-1 at 350-51.

The plaintiff had a neurology check-in on November 2, 2022, to discuss her upcoming Rituximab infusion. Filing 14-2 at 114. She was told there "may be a mental component" to her complaints of feeling worse before the infusion, "as she has remained B Cell depresse[d] prior to infusion." *Id.* She was also told to make an appointment with ophthalmology, as she had not had an appointment since January 2020.

Her next neurology appointment was on June 6, 2023, with Krystian Solis, M.D. The plaintiff complained about bilateral leg pain, neck pain, headaches, urinary retention problems, and fatigue. Dr. Solis noted, as had been noted before, her symptoms tended to get worse leading up to the next infusion. She still had not had an ophthalmology appointment, despite her neurologists' continued recommendations and referrals. Filing 15-1 at 301.

On November 9, 2023, the plaintiff saw Chelsie Thompson, DO, in neurology. The plaintiff reported increasing headaches and had started walking with a cane due to leg, back, and hip pain. She was told to continue

11

with Rituximab, establish care with ophthalmology, visit with sleep medicine concerning her fatigue, take B12 supplements, and continue with her pain specialist and headache care. Filing 15-1 at 352.

### (b) Headaches

Since the onset of her NMO treatment in October 2018 through March 2024, the plaintiff went to the ER for headache treatment on the above-referenced dates, and the following: November 25, 2018; December 20, 2018; March 15, 2019; March 24, 2019; October 3, 2020; February 1, 2021; February 15, 2021; February 21, 2021; March 30, 2021; July 21, 2021; October 27, 2021; April 22, 2022; October 15, 2022; February 17, 2023; March 9, 2023; and March 16, 2024. Sometimes her headaches were related to other ailments, like dental issues or upper respiratory infections ("URIs"). *E.g.,* filing 8-1 at 15 (impacted molar),[5] 549 (URI); filing 9-1 at 125 (after dental procedure); filing 12-1 at 328 (URI).

The plaintiffs' treating physicians generally suspected, based on her labs and other workups, that her headaches were not related to her NMO. She was having tension headaches, not migraines. *See* filing 12-1 at 88 (low suspicion for optic neuritis), 159 (symptoms not likely complication of demyelinating disease), 145 (not suspected demyelinating process), 549 (labs stable, inflammatory markers normal, CT without evidence of acute pathology); filing 13-1 at 16 (not necessary to treat for NMO exacerbation); filing 15-1 at 47 (no acute pathology), 245 (suspicion for tension headache, NMO flare-up not suspected), 252 (no red flag signs or symptoms). Generally, when the plaintiff

---

[5] There are no dentistry records in the administrative record, but it appears the plaintiff had a complete upper teeth extraction in October 2020, *see* filing 13-1 at 2; filing 9-1 at 125.

presented to the ER, she was given some combination of saline bolus, caffeine, Toradol, Benadryl, Reglan, Compazine, Zofran, and Haldol, after which the plaintiff would report her symptoms had improved and she would be discharged.

The plaintiff called the clinic and spoke with Danielle Rhynalds, RN, on January 9, 2019, because she had "sharp pains in head when getting out of bed in the middle of the night." Filing 10-1 at 394. The episode resolved after five minutes, when the plaintiff laid back down. She was advised to take her blood pressure during an episode if it happens again. *Id.*

The plaintiff started specialized treatment for her headaches at the University of Nebraska headache clinic on February 12, 2019. She first saw Amrita-Amanda Vuppala, M.D., and reported intermittent difficulty using her left hand, back pain, poor appetite, and weight loss. Filing 8-1 at 453. Dr. Vuppala adjusted the plaintiff's headache and pain medication and started her on Effexor.

The subsequent appointments at the headache clinic were with Autumn Nye, APRN, beginning September 3, 2019. *See* filing 10-1 at 225-26. The plaintiff had been taking Tylenol and ibuprofen several times a day, every day. The tizanidine helped, but the Maxalt was not working. Filing 10-1 at 226. She had a normal gait. Filing 10-1 at 230. Nye recommended Aimovig injections and tizanidine, and "no over the counter pain meds," with a follow-up in three months. *Id.*

The plaintiff called her doctor's office October 7, 2019, and spoke to Ashley King, LPN. The plaintiff's headaches were "back worse than they have been," and she was slurring her speech. Filing 10-1 at 207. The only medication she took was Valium. *Id.* King noticed the plaintiff's speech was slurred if she talked faster. Dr. McLaughlin suggested that the plaintiff go to the ER. *Id.*

At the ER, the plaintiff was given the migraine cocktail and she was admitted. A head CT and a brain, cervical, and thoracic MRI were performed. Filing 10-1 at 184; filing 11-1 at 60. The MRI showed no evidence of acute infarction or acute intracranial hemorrhage or mass effect. Filing 11-1 at 60. There were no findings for active demyelination or disease progression. *Id.* The spinal cord lesions were decreasing in conspicuity. Filing 10-1 at 197. She also had a normal gait with no ataxia, and mild swaying without falling. *Id.* The plaintiff said her headache had improved with the migraine cocktail, and she was discharged the next day with a prescription for Gabapentin. Filing 10-1 at 203, 181.

On October 9, 2019, the plaintiff called her doctor's office "requesting something for pain for her neck and head." Filing 10-1 at 179. The plaintiff did not want to use the migraine cocktail because "it puts her to sleep," and she had to take care of her two-year-old son. *Id.* Dr. Marcelin was "uncomfortable continuing to prescribe her narcotics for her migraine" because it was not the right treatment. He suggested the migraine cocktail or a referral to the pain clinic. *Id.* The plaintiff "did not seem interested" in a referral, and she took Tylenol and ibuprofen. Filing 10-1 at 179.

She called her doctor again on October 14, 2019, again requesting "something to curb pain." Filing 10-1 at 177. She said when she was in the ER, she had Norco, which helped with her pain. The plaintiff requested a referral to the pain clinic, as Dr. Marcelin had suggested. *Id.*

On December 6, 2019, the plaintiff reported to Nye that she had one headache per week, helped by head and neck rubs and relaxing. Filing 9-1 at 199-200. The plaintiff denied decrease in vision, dipoplia, and blurry vision. Nye's physical examination was normal; she described the plaintiff as "alert, oriented to self, location, date, and situation," normal motor strength, and

14

normal gait "with normal stepping, good and stable turns, normal and symmetric arm swings." Filing 9-1 at 203. Nye told the plaintiff to follow up in six months. Filing 9-1 at 204.

The plaintiff stopped seeing Nye because she said she stopped having headaches. Filing 9-1 at 155. But on June 29, 2020, she called the clinic because she had a "really bad headache" and mild nausea. *Id*. Because the headache described was similar to those in the past, and the past prescriptions had helped the plaintiff, Melanie Lozano, RN, prescribed ibuprofen, Reglan, and Benadryl. *Id*.

On January 26, 2021, the plaintiff called her doctor's office because of a bad headache and blurry vision. Filing 12-1 at 89. Her normal medications did not provide relief. She was told to see Nye at the headache clinic. Filing 12-1 at 90. The plaintiff saw Nye on February 8, 2021. Filing 12-1 at 73. The plaintiff reported that she had five headaches a week. Nye recommended physical therapy and sumatriptan, and scheduled a follow-up in three months. Filing 12-1 at 78.

The plaintiff did not return to Nye until August 17, 2021. Filing 12-1 at 571. She said her headaches had been better, but were starting to worsen since her last Rituximab injection. Nye restarted Aimovig and Maxalt and told the plaintiff to continue physical therapy. However, the plaintiff was discharged from physical therapy on August 12, 2021, because she had not been seen in over 30 days and had canceled five visits. Filing 12-1 at 573.

The plaintiff saw Nye again on November 22, 2021, and was told to continue Aimovig and physical therapy. Nye also prescribed Eletriptan to use as needed. Filing 13-1 at 79. On April 19, 2022, the plaintiff told Nye the Eletriptan was not helpful. Filing 13-1 at 364. The plaintiff said the migraine cocktail (Benadryl, Reglan, and Toradol) was helpful but made her sleepy. Nye

15

recommended continuing Aimovig, to use Ubrevly as needed, and to follow up in three months. Filing 13-1 at 364. On August 2, 2022, the plaintiff told Nye the Ubrevly was not helpful. Filing 14-2 at 70. Nye switched to Nurtec, and told the plaintiff to continue Aimovig and her migraine cocktail, and use Nurtec as needed.

The plaintiff told Nye the Nurtec was helpful at their next appointment on November 7, 2022. She still complained that the migraine cocktail made her sleepy. Nye made no changes to the plaintiff's headache regimen. Filing 14-2 at 121. At the follow-up on February 6, 2023, the plaintiff reported headaches a couple times per month, and that she had headaches related to nasal congestion. Nye continued Aimovig and Nurtec and prescribed a prednisone taper to help with the congestion. Filing 15-1 at 234.

On May 10, 2023, Nye switched the plaintiff from Aimovig to Emgality, as the Aimovig had not been helpful and the plaintiff reported more frequent and worse migraines. Filing 15-1 at 281. The plaintiff told Nye on August 18, 2023, that Emgality was working better. Filing 15-1 at 323. The plaintiff also considered botox. Nye added tizanidine, to be taken as needed, to the plaintiff's regimen at the next follow up on December 1, 2023. Filing 15-1 at 365.

On the March 25, 2024, visit with Nye, the plaintiff reported 3-5 headaches per month, but daily headaches in the previous two weeks. Nye prescribed a 5-day prednisone course to help the plaintiff's congestion-related headaches. Filing 15-1 at 418. Otherwise, Nye continued the plaintiff on Emgality once per month, and Nurtec and tizanidine as needed. Filing 15-1 at 424.

16

(c) Chronic Back, Neck, and Shoulder Pain

The plaintiff has had low back pain as early as 2015. *See* filing 10-1 at 6. She has sought various treatment, both before and after the alleged onset date of disability, to manage her pain, including chiropractic care with Ben Zurek and on-and-off physical therapy (*see generally* filing 14-1; filing 12-1; filing 14-2; filing 16-2; filing 15-1, *passim*). Generally, the plaintiff reported consistent pain with little improvement.

Throughout the relevant period, she saw Dr. Chris Criscuolo in the pain clinic to manage these symptoms. The plaintiff saw Dr. Criscuolo regularly beginning November 5, 2019, at first once a month, then every other month, and then every three months. At each appointment, she reported stable symptoms and had her pain medication prescription renewed (first hydrocodone, and later Percocet). Filing 9-1; filing 12-1; filing 15-1 at 212; filing 15-1 *passim*. She had myofascial trigger point injections occasionally, but saw no significant improvement, and had trouble having her insurance pay for the injections. *See* filing 9-1 at 30, filing 15-1 at 216. The last appointment with Dr. Criscuolo in the record was in August 2022. *See* filing 15-1 at 216.

The plaintiff saw Dr. Marcelin on December 28, 2018. She reported an improvement in her headaches, though she was having difficulty walking. She was interested in a walker, and Dr. Marcelin believed she would benefit from using one. Filing 8-1 at 420, 423.

On April 27, 2019, the plaintiff went to the ER complaining of back pain and shortness of breath. She had normal heart and respiratory rates and she was not in respiratory distress. She was instructed to take ibuprofen and Tylenol, and she could use Lidoderm patches if needed. Filing 8-1 at 567.

On May 31, 2019, the plaintiff saw Dr. Marcelin to treat diffuse body aches and lower back pain, as well as her intermittent headaches that were

not alleviated by her current pain medications. Dr. Marcelin prescribed hydrocodone, and told her "we will not continue refilling the prescription." Filing 8-1 at 571.

The plaintiff called her doctor's office on September 23, 2019, because she "had some pain between shoulder blade and spine on right side," and physical therapy was making it worse. Filing 10-1 at 221. Julie Nieveen, APRN-NP, suggested a massage (not deep tissue) or Icy Hot, and to follow up with Dr. Marcelin if there was no improvement. Filing 10-1 at 221. The plaintiff went to the ER. Filing 10-1 at 216. At the hospital, after consulting with a neurologist, the plaintiff was treated with Toradol and dexamethasone for her right rhomboid muscle spasm. Filing 10-1 at 219, 214. She started on a Decadron taper and Valium instead of baclofen. Filing 10-1 at 219.

On September 25, 2019, she followed up her ER visit with Dr. Marcelin, reporting "mild to moderate improvement" and "mild" pain. Filing 10-1 at 213. She had another Toradol injection and Dr. Marcelin counseled her on health risks for her elevated BMI, and he suggested strategies for weight loss. Filing 10-1 at 214.

On January 27, 2021, the plaintiff called the clinic to discuss pain in her back that her medications were not helping. Filing 12-1 at 89. She was told to contact her pain doctor. Dr. Criscuolo prescribed Flexeril. Filing 12-1 at 51. She went to the ER on April 9, 2021, because of chronic back pain that had worsened with her physical therapy throughout March of 2021. Filing 12-1 at 315. Her pain improved when the hospital administered lidocaine and Toradol. *Id.*

The plaintiff had been attending physical therapy, but she was discharged on August 29, 2022, because of "generalized inconsistencies in her pain reports and symptoms of pain." Filing 14-2 at 88. At that appointment,

18

she said that her pain was in her low back, where she had originally reported pain in her neck. When the physical therapist discussed the difference with her, "she immediately switched her reports of pain to be in her neck again." *Id.* The physical therapist believed the plaintiff confused general soreness with pain concerns and recommended she hold on therapy for the time being. *Id.*

The plaintiff reported diffuse joint pain to Dr. Marcelin on September 26, 2022. Filing 14-2 at 95. She was recommended to use a muscle relaxer and follow with a hot bath. She was prescribed Nurtec and Lioresal. *Id.*

The plaintiff went to the clinic on January 9, 2023, due to her back pain. Filing 15-1 at 223. She was prescribed a steroid, Decadron, because that had helped her pain in the past. Filing 15-1 at 224.

### (d) Upper Respiratory Symptoms

Throughout the relevant period, plaintiff suffered from chronic congestion, rhinorrhea, ear pain, and other upper respiratory symptoms. Often, she was sick with viral illnesses, likely contracted from her young son, and was told to employ symptomatic treatment. *See, e.g.,* filing 8-1 at 538. She was regularly prescribed prednisone, though Dr. Marcelin and others were concerned about long-term steroid use. Filing 12-1 at 288-89; filing 12-1 at 284; filing 12-1 at 273; filing 13-1 at 386; filing 13-1 at 376; filing 14-2 at 76; filing 15-1 at 239; filing 15-1 at 387. She used various medications, both prescription and over the counter, to treat her symptoms, including nasal cones, Nasacort, Astelin, Sudafed, Singulair, albuterol, a nebulizer, Tessalon Perles, Phenergan with codeine, Omnicef, and Augmentin.

Beginning in March 2022, the plaintiff saw specialists in the Allergy, Asthma, and Immunology Clinic. *E.g.,* filing 13-1 at 386; filing 13-1 at 376. The plaintiff had a rhinoplasty in November 2022 to treat her chronic nasal

congestion, filing 14-2 at 121-124, but her symptoms did not resolve and she continued to seek treatment for upper respiratory issues throughout the administrative record. *E.g.,* filing 15-1 at 235, 230; filing 15-1 at 261; filing 15-1 at 274. In 2023, she began going to the Pulmonary Clinic. *See* filing 15-1 at 376; filing 15-1 at 416.

### (e) Other Medical Problems

The plaintiff had problems with urinary retention. She first went to the hospital on December 30, 2020, and was treated for a urinary tract infection and discharged. Filing 9-1 at 95. She returned to the ER on January 2, 2021, after experiencing dysuria, but denied further intervention (foley catheter and leg bag). Filing 9-1 at 80. She followed up with Dr. Marcelin, on January 7, 2021, reporting mild dysuria but overall improved symptoms. Filing 9-1 at 71. It was unclear if these issues were related to NMO.

After starting her Rituximab infusions, the plaintiff had several recurrent shingles episodes starting in 2019, which often coincided with coughs and congestion. She was typically prescribed Valtrex and the issue would resolve. *See* filing 9-1 at 186, 188; filing 9-1 at 138; filing 9-1 at 147, 138; filing 9-1 at 128; filing 9-1 at 67; filing 12-1 at 79; filing 13-1 at 16; filing 13-1 at 87; filing 13-1 at 389; filing 15-1 at 353. She went to the clinic with what appeared to be hives on August 19, 2022, which was treated with Zyrtec and Pepcid. Filing 14-2 at 82. She was told to stay hydrated. *Id.* At her annual exam a few days later, Dr. Marcelin thought she may have skin dermatitis. Filing 14-2 at 86. He prescribed hydroxyzine and a topical triamcinolone. *Id.*

She had a polycystic ovary in April 2021, *see* filing 12-1 at 294, and a bilateral salpingectomy on June 17, 2021. Filing 12-1 at 543. On March 14, 2024, the plaintiff went to the ER with back pain and was found to have an

20

enlarged ovary. Filing 15-1 at 406. She was given a dose of oxycodone, but the treating physician assistant noted there was "nothing much that I can add on to the patient's regimen from a prescription standpoint as she already has these medications at home." Filing 15-1 at 406.

The plaintiff also suffered from fatigue. B12 injections would help; Dr. Marcelin administered one on January 26, 2023, and October 17, 2023. *See* filing 15-1 at 227, 353. Dr. Marcelin attributed the fatigue to depression, or not enough good sleep. She was prescribed trazodone to help with sleep. She saw Stefanie Breitkreutz, PA, at the Sleep Disorder Center, to address her fatigue. Filing 15-1 at 366. After testing, she had an Epworth Sleepiness Scale score of 3, which is a low score, and was not concerning. Breitkreutz recommended that the plaintiff be tested for sleep apnea. Those tests, if they occurred, are not in the record.

## 2. MEDICAL OPINIONS

The plaintiff's chiropractor, in an undated letter, opined that he thought the plaintiff "would have a hard time working and holding a job." Filing 12-1 at 209. He said the plaintiff was "struggling with constant pain on a daily basis." *Id.*

Kevin Berryman, Ph.D., conducted a consultative psychological report of the plaintiff's limitations for disability benefits on April 6, 2021. He conducted a Wechsler Memory Scale (Fourth Edition) test, and the plaintiff's memory abilities in some areas were in the borderline to extremely low range. Filing 12-1 at 202-03.

Lee Branham, Ph.D., a non-examining agency psychological consultant, evaluated the plaintiff's initial claim for disability on November 24, 2021. Dr. Branham opined that the medical evidence showed the plaintiff could "perform

21

adequately in reporting symptoms and discussing treatment options," and there was no medical evidence of clinical cognitive issues. Filing 7-3 at 5. He opined that the "pattern of evidence is consistent with moderate work-related limitations." *Id.* Specifically, he opined the plaintiff had moderate limitations in the ability to understand, remember, or apply information; to concentrate, persist, or maintain pace; and to adapt or manage oneself. Filing 7-3 at 6. He opined that she had a mild limitation in interacting with others.

Daniel Camden, M.D., a non-examining agency medical consultant, evaluated the plaintiff's physical limitations for her initial claim on December 14, 2021. *See* filing 7-3 at 9. He opined that the plaintiff "has documented severe impairments," but she retained "the ability to perform light work." *Id.* On reconsideration, Alexandra Suslow-Geditz, M.D., agreed with Dr. Camden. *See* filing 7-3 at 44.

Patricia Newman, Ph.D., a non-examining agency psychological consultant, opined on reconsideration that the plaintiff did not have a medically determinable mental impairment. Filing 7-3 at 28-29.

Dr. McLaughlin, the plaintiff's treating neurologist, provided a written opinion that the plaintiff had moderate physical limitations, dated May 11, 2024. Filing 16-2 at 81. He indicated the plaintiff did not have an extreme limitation in the ability to stand up from a seated position, but did have an extreme limitation in balance while standing or walking. Filing 16-2 at 81. He indicated no or mild limitations in understanding, remembering, or applying information; interacting with others; and concentrating and persisting. He found a moderate limitation in maintaining pace. Filing 16-2 at 82.

### 3. ADMINISTRATIVE HEARINGS

The plaintiff's first hearing with the ALJ was December 5, 2022. Filing 7-2 at 73. The plaintiff described her past work as a cashier and supervisor at Runza. She testified that she cannot stand for longer than 10-15 minutes due to pain in her lower back, hips, and legs, and also cannot sit for longer than half an hour. Filing 7-2 at 80. She stated that treatment and medications were not helping.

She also said she was getting headaches "once a day." Filing 7-2 at 81. She used her "headache cocktail" (Reglan, Benadryl, and ibuprofen) either a couple times a month or once a month, when she would "absolutely have to" because it would make her lay down and fall asleep for half an hour to an hour. Filing 7-2 at 88. She described problems with focusing and memory. She said she occasionally needed help caring for her son. She could cook and follow a recipe, but her boyfriend handled laundry, vacuuming, and household finances. Filing 7-2 at 84-85. She also said she did not drive.[6]

The ALJ asked a vocational expert about a hypothetical person who could work at the light exertional level; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; occasionally work around hazards such as unprotected heights or moving mechanical parts; never operate a motor vehicle as part of the regular job duties; tolerate occasional exposure to high humidity, pulmonary irritants, or extreme hot or cold temperatures; mentally able to perform simple and routine tasks; and could respond appropriately to occasional changes in

---

[6] The plaintiff claims one of her doctors told her not to drive, but other than her testimony, no evidence of that recommendation is in the administrative record.

work duties. Filing 7-2 at 94. The vocational expert opined that the hypothetical person could perform as a fast food worker, but not supervisor.

The ALJ then asked about vision limitations, which did not change the expert's opinion. The ALJ changed the exertional level to sedentary, which meant the fast food job was "out." Filing 7-2 at 95. But the vocational expert identified some sedentary occupations the plaintiff could still perform. Filing 7-2 at 95.

After the plaintiff's successful appeal, a second hearing was held on May 14, 2024. *See* filing 7-2 at 52. The plaintiff told the ALJ the biggest issues keeping her from working were "headaches and then the pain alone." Filing 7-2 at 58. She said that standing and sitting were painful in her lower back, hip, legs, and feet. She takes hot soaks every day to help the pain. She said she had headaches "bad enough that [she] wouldn't be able to get into work" at least "a couple times a week." Filing 7-2 at 59. She also discussed memory problems, but denied any mental health issues that would keep her from working. Filing 7-2 at 60. She had started using a cane. Filing 7-2 at 65-66. The plaintiff described vision issues, and said she had not been to see her eye doctor because she could not get a ride. Filing 7-2 at 67.

The ALJ gave a vocational expert a hypothetical example with similar (if not identical) sedentary work restrictions to the previous hearing. The expert identified three positions the plaintiff could perform. Filing 7-2 at 69-70.

24

#### 4. SEQUENTIAL ANALYSIS AND ALJ FINDINGS[7]

##### (a) Steps One and Two

The ALJ found that the plaintiff was not disabled and she was not entitled to benefits. Filing 7-2 at 29. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); § 404.1520(a)(4)(i).

Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act through December 31, 2020, and that the plaintiff had not engaged in substantial gainful activity since October 28, 2020, the plaintiff's alleged onset date. Filing 7-2 at 31.

At step two, the medical severity of the claimant's impairment is considered. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activity. *Gonzales*, 465 F.3d at 894.

The ALJ found the following severe medically determinable impairments: NMO, migraine headaches, central nervous system demyelinating disease, and unspecified neurocognitive disorder. Filing 7-2 at 31. The ALJ found the following non-severe impairments: low vision, degenerative disc disease of the lumbar spine and of the cervical spine, obesity, skin dermatitis, and chronic allergic rhinitis. Filing 7-2 at 32-33.

---

[7] Only the operative ALJ opinion, from July 1, 2024, is detailed in this Order.

The ALJ reasoned that the plaintiff's complaints of low vision predated, and did not continue beyond, the alleged onset date. Filing 7-2 at 32. He also explained that throughout the administrative record, the plaintiff's degenerative disc diseases were described as "mild," her gait was "intact" and "normal," and she retained full strength in her grip and upper extremities. *Id.* Her obesity did not affect her gait or the ability to stand from a squatted position. Filing 7-2 at 33. And her rhinitis did not affect her respiration rate or oxygen saturation rate, nor was there evidence of stridor. *Id.*

### (b) Step Three

At step three, the medical severity of the claimant's impairments is further considered. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales*, 465 F.3d at 894. The ALJ found that the plaintiff's impairments, considered singly or in combination, did not meet or equal any specific listing. Filing 7-2 at 33.

While NMO can be a presumptively disabling impairment, the ALJ determined the plaintiff did not meet the requirements of 20 C.F.R. Part 404, Subpart P, Appx. 2, § 11.09, because the medical record did not establish disorganization of motor function in two extremities, nor any marked limitation in physical functioning. Filing 7-2 at 33.

The ALJ considered the requirements in SSR 19-4p to evaluate the plaintiff's migraines. The plaintiff "generally reports fewer headaches on her prescribed medical regimen," and indicated her medications worked well. Filing 7-2 at 33. She had no marked limitations and her cranial nerves

appeared in tact. Therefore, the ALJ determined her headaches did not meet or medically equal the severity of a listed impairment.

The ALJ also considered the plaintiff's mental impairments. He considered the "paragraph B criteria," contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. Four "broad functional areas" are used to evaluate mental limitations: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." § 404.1520a(c)(3). The ALJ concluded that the plaintiff had a moderate limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself. Filing 7-2 at 34-35.

The ALJ determined that the plaintiff's subjective complaints about the intensity, persistence, and limiting effects of her symptoms—which included her "constant pain, poor memory, and frequent headaches"—were "not entirely consistent with the medical evidence and other evidence in the record." Filing 7-2 at 36. Her symptoms following her diagnosis of demyelinating disease were "generally stable" throughout the record, and she regularly denied new or worsening neurological symptoms from her diagnosis to the most recent records. *Id*. Further, the recent imaging studies of her brain continued to reveal a stable, mild, non-specific multifocal abnormality. Filing 7-2 at 37.

The ALJ noted the frequency of the plaintiff's headaches improved with her medical regimen. And despite the plaintiff's reported severity of her headaches, she did not present to medical examinations in any acute or apparent distress; did not show dysarthria or word-finding difficulties; and did not appear sleepy or lethargic. Filing 7-2 at 37. Her cranial nerves appeared intact.

The plaintiff's reported memory issues were treated conservatively, suggesting "the impairment is not as severe as alleged." Filing 7-2 at 37. The ALJ considered examination notes from the plaintiff's treating providers and the consultative examination with Dr. Berryman.

The ALJ considered the plaintiff's daily activities, which did not support the reported severity of her impairments. She was able to perform personal care tasks, and appeared well-groomed. She could prepare meals and shop, and, despite her contrary testimony at the hearing, the plaintiff admitted she could vacuum and do small loads of laundry and dishes. Filing 7-2 at 38.

The ALJ found the opinions of Dr. Camden and Dr. Suslow-Geditz to be somewhat persuasive, except that the ALJ found the medical record did not support visual limitations and more recent evidence supported greater exertional limitations. Filing 7-2 at 30. The ALJ found the chiropractor's opinion not persuasive. He considered Dr. McLaughlin's opinion, but found it not persuasive because it was not supported by Dr. McLaughlin's own treatment notes and was inconsistent with the record as a whole.

Regarding the plaintiff's mental limitations, the ALJ found Dr. Newman's opinion unpersuasive as unsupported by the record available. He found the opinions of Dr. Berryman and Dr. Branham to be generally persuasive, as both were consistent with the available medical evidence, including how the plaintiff's treating providers described her mood, behavior, insight, and judgment. Filing 7-2 at 40.

### (c) Steps Four and Five

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales,* 465 F.3d at 894; §§ 416.920(a)(4)(iv) & (f), 404.1520(a)(4)(iv) & (f). If the claimant can still do her

past relevant work, she will be found to be not disabled; otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; §§ 416.920(a)(4)(v) & (g), 404.1520(a)(4)(v) & (g).

At step four, the ALJ found that the plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except she can never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, and crawl. He found she can work in an environment with no more than moderate noise level; tolerate occasional exposure to high humidity, extreme hot and cold temperatures, and pulmonary irritants; never work around hazards (such as unprotected heights and moving, mechanical parts); and never operate a motor vehicle as part of her regular job duties. Mentally, the ALJ found the plaintiff can perform simple and routine tasks, and respond appropriately to occasional changes in work duties.

The ALJ determined the plaintiff could not perform past relevant work. Based on the plaintiff's residual functional capacity, age, education, and work experience, and relying on the vocational expert's testimony from the hearing, the ALJ determined three different representative occupations with significant numbers in the national economy that the plaintiff could perform. Filing 7-2 at 42. The ALJ confirmed that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. Based on those findings, the ALJ found the plaintiff was not disabled.

29

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner for errors of law and to determine whether the denial is supported by substantial evidence on the record as a whole. *Byes v. Astrue,* 687 F.3d 913, 915 (8th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*.

The Court considers the entire administrative record—the evidence that detracts from the decision, as well as the evidence that supports it—but the evidence is not reweighed. *See id*. Instead, the Court will disturb the ALJ's decision only if it falls outside the available "zone of choice.*" Kraus v. Saul,* 988 F.3d 1019, 1024 (8th Cir. 2021). If the record contains evidence that a reasonable person might accept as adequate to support the ALJ's conclusion, the Court may not reverse—even if it would reach a different conclusion, or merely because there is also evidence that might support a contrary outcome. *See id*.; *Byes*, 687 F.3d at 915.

The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue,* 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue,* 652 F.3d 860, 863 (8th Cir. 2011).

## IV. DISCUSSION

The plaintiff argues several bases for reversing the ALJ's finding of not disabled. She argues the ALJ failed to address her medication-caused immune

30

deficiency; erroneously discounted her recurring vision issues; and failed to consider a period of disability (from October 2020 to November 2022). She also argues the ALJ's determination of her residual functional capacity is not supported by substantial evidence.

### 1. IMMUNE DEFICIENCY

The plaintiff argues her immune deficiency should have been considered a severe impairment, or should have been addressed with other non-severe impairments. She received infusions of Rituximab every six months beginning May 2019, which she claims caused recurrent shingles outbreaks and chronic upper respiratory problems. The government argues plaintiff did not present these issues as a basis for her alleged disability, so the ALJ did not err in failing to consider them. Filing 29 at 5.

The Eighth Circuit "has repeatedly stated that an ALJ has no duty 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" *Smith v. Astrue*, 232 F. App'x 617, 619 (8th Cir. 2007) (quoting *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003)). The plaintiff listed neither her immune suppression, nor any of the (alleged) side effects, as disabling conditions on any of her applications for disability. *See* filing 7-6 at 21-23; filing 7-6 at 13. She also did not discuss any side effects from her infusions at either hearing before the ALJ. *See* filing 7-2 at 58; filing 7-2 at 78, 80.

There are a few references in the medical records that her immune system was suppressed, but her symptoms were managed by neurology and generally resolved quickly. *See* filing 9-1 at 180, 194; filing 12-1 at 466 (plaintiff reported her shingles outbreaks "usually resolve[] in a day or two"). No medical professional in the record linked her shingles outbreaks to her Rituximab

31

infusions. The ALJ did not err when he did not investigate the plaintiff's immune suppression.

## 2. VISION ISSUES

The plaintiff next argues that the ALJ erred in failing to develop the record regarding the plaintiff's alleged recurring blurry vision issues. She also asserts the ALJ erred by not considering the period between October 2020 and November 2022, before her vision reached 20/20 in her right eye and 20/25 in her left.

The ALJ's duty to develop the record is not never-ending, and an ALJ is not required to disprove every possible impairment. *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). Here, there was *voluminous* evidence about the plaintiff's NMO and its effects, from a variety of physicians. *See id.*; *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) (case remanded where treating physician's notes contained only dates and reasons for treatment, and no other physician evaluated the plaintiff's headaches).

The ALJ determined that the plaintiff's low vision only minimally limits her ability to engage in basic work activities. Filing 7-2 at 32. The plaintiff has not seen an eye doctor since January 2020, nine months before the alleged onset date of disability, and, at that appointment, Dr. Legge noted her vision was clinically improving. *See* filing 9-1 at 196. Even as early as November 2019, the plaintiff reported that her vision was improving. Filing 9-1 at 206. Other than the plaintiff's subjective complaints related to her headaches, there is no evidence that the plaintiff's vision was affected by her NMO. *See* filing 12-1 at 467 (plaintiff's vision "is quite improved from prior exams even though she feels like her vision is more blurry today"). The ALJ's decision that the

plaintiff's vision issues were not a severe impairment after the alleged onset date of disability is supported by substantial evidence.

Nor can the plaintiff succeed on her argument that she was visually impaired for a period of time. She asserts that the ALJ erred because he did not consider a period of disability for the period of time before her vision reached a "near-normal" level. *See* filing 25 at 42.

The plaintiff did not see an eye doctor after January 2020. There are very few measurements of the plaintiff's vision throughout the administrative record. In July 2019, the plaintiff's vision was 20/70 in her left eye and 20/50 in her right, with corrective lenses. Filing 10-1 at 266. The next available vision measurement is from May 2021, when Dr. McLaughlin noted 20/50 in both eyes, with corrected lenses. Filing 12-1 at 467.

These numbers mean little to the Court. The American Optometric Association states that 20/30 to 20/60 vision is considered "mild vision loss, or near-normal vision." Am. Optometric Ass'n, Low Vision and Vision Rehabilitation, https://www.aoa.org/healthy-eyes/caring-for-your-eyes/low-vision-and-vision-rehab [https://perma.cc/8GL6-NEDZ] (last visited February 2, 2016). The same source explains:

> Visual impairments take many forms and exist in varying degrees. It is important to understand that visual acuity alone is not a good predictor of the degree of problems a person may have. Someone with relatively good acuity (e.g., 20/40) can have difficulty functioning, while someone with worse acuity (e.g., 20/200) might not be having any real problems.

*Id.* The plaintiff reported vision problems related to her headaches, which were managed and monitored; her vision issues often resolved before the headache did. There is no indication that the plaintiff's visual acuity caused additional problems.

To the extent the plaintiff argues the ALJ should have modified her residual functional capacity to account for her vision problems, the plaintiff's "near-normal" vision, dating back to July 2019, would not have affected the jobs identified. *See* filing 25 at 43 (citing the Dictionary of Occupational Titles). The ALJ's arguable deficiency in opinion-writing technique has no bearing on the outcome, and does not warrant remand. *See Buckner*, 646 F.3d at 559.

### 3. SUBSTANTIAL EVIDENCE

Finally, the plaintiff argues the ALJ's residual functional capacity determination was not supported because it failed to account for the plaintiff's worsening symptoms leading up to her Rituximab infusions. The plaintiff asserts the ALJ's failure to take these "cycles" into account warrants remand. Filing 25 at 44. The plaintiff argues it was error for the ALJ's determination of the plaintiff's residual functional capacity not to include limitations related to unscheduled absences caused by her Rituximab infusions.

The plaintiff effectively asks the Court to reweigh the evidence before the ALJ. It declines to do so. The ALJ determined the plaintiff's subjective complaints about her symptoms, including her headaches and pain leading up to her infusions, were not supported by the objective medical evidence. *See* filing 7-2 at 36, 37. This determination is supported by substantial evidence.

At the hearing, the plaintiff inconsistently reported the frequency and intensity of her headaches, first claiming she had daily headaches, but "severe" headaches either a few times a week, or once a week. *See* filing 7-2 at 57, 58,

62. These inconsistencies run throughout the record, and the plaintiff's description of her symptoms does not match the examination records of her treating physicians. *See, e.g.,* filing 14-2 at 88; filing 8-1 at 95. Her doctors often determined that her NMO did not cause her headaches, *supra,* so it's unlikely that her headaches or symptoms were related to the Rituximab infusions. The objective medical evidence indicated that the plaintiff's symptoms were stable and improving. The ALJ's determination of the plaintiff's residual functional capacity is supported by substantial evidence.

## V. CONCLUSION

The ALJ did not err in determining the plaintiff is not disabled. While the ALJ may not have accounted for every doctor's appointment or ailment described by the plaintiff in the lengthy record, this Court's deferential review finds no reversible error. The ALJ's evaluation of the plaintiff's subjective complaints compared to the administrative record is supported by substantial evidence. The Court will not re-weigh the record to give additional weight to the plaintiff's descriptions of her symptoms. Accordingly,

IT IS ORDERED:

1.  The plaintiff's motion for reversal of the Commissioner's final decision (filing 24) is denied.

2.  The Commissioner's motion to affirm the Commissioner's filing decision (filing 28) is granted.

3.  The plaintiff's complaint is dismissed.

35

4.    A separate judgment will be entered.

Dated this 18th day of February, 2026.

BY THE COURT:

_John M. Gerrard_____

John M. Gerrard
Senior United States District Judge

36